992 F.2d 1216
 144 L.R.R.M. (BNA) 2744
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
BADDOUR, INCORPORATED, Respondent.
 No. 92-5438.
 United States Court of Appeals, Sixth Circuit.
 April 30, 1993.
 
 On Application for Enforcement of an Order of The National Labor Relations Board, Nos. 26-CA-9846, 26-CA-9957 and 26-CA-10121.
 N.L.R.B.
 ORDER ENFORCED.
 Before BOGGS and GUY, Circuit Judges, and GIBSON, Chief District Judge.[1]
 PER CURIAM.
 
 
 1
 This case is before the court on the Board's applications for enforcement of its supplemental order determining the amount of backpay and expenses Baddour owed to two employees. Baddour contests the amount of money owed. Because Baddour's position is wholly without merit, we enforce the order.
 
 
 2
 * On September 26, 1986, the Board found that, inter alia, Baddour violated Section 8(a)(3) and (1) of the National Labor Relations Act ("Act"), codified at 29 U.S.C. § 158(a)(3) and (1), by discriminating against Larry Mayes and Jerry Williams in retaliation for exercising their statutorily protected rights. Baddour, Inc., 281 NLRB 546 (1986). The Board's order required that the Company offer the discriminated-against employees full reinstatement and make them whole for any lost wages. This court enforced the Board's decision.
 
 
 3
 The parties failed to agree on the amount of backpay due Mayes and Williams, and a supplemental backpay proceeding was initiated pursuant to the Board's Rules and Regulations, Series 8, as amended, 29 C.F.R. § 102.52. According to the ALJ who presided over the supplemental hearing, the relevant backpay period for Mayes was August 28, 1982, the date of discharge, to November 29, 1988, the date on which the company offered reinstatement. For Williams, the relevant period was April 11, 1983, the date of discharge, up to the present, because the ALJ determined that the Company still has failed to offer reinstatement. The formula was lost wages, minus interim earnings, plus expenses.
 
 
 4
 The Company did not dispute the method used to calculate the money owed. However, with respect to Mayes, Baddour asserted that he ceased to be entitled to benefits when he allegedly abandoned substantially equivalent interim employment. The Company also contested Mayes's entitlement to moving expenses accrued in connection with his search for interim employment. Concerning Williams, Baddour denied that he is entitled to any backpay, assertedly because the firm did reinstate him, and then lawfully discharged him based upon an economic downturn.
 
 
 5
 The Board affirmed the ALJ, and issued a supplemental decision supporting the claims of Mayes and Williams. It ordered that the Company pay Mayes backpay in the amount of $9,693.53, and pay Williams backpay in the amount of $32,890.63. The Board then brought this timely petition for enforcement. Baddour contests the amount owed.
 
 II
 
 6
 Section 10(c) of the Act, 29 U.S.C. § 160(c), gives the Board discretion to award backpay as a remedy for unfair labor practices. NLRB v. J.H. Rutter-Rex Mfg. Co., 396 U.S. 258, 262, 90 S.Ct. 417, 419 (1969). Judicial review is thus limited to a determination of whether the Board has abused its discretion in fashioning a remedial order. NLRB v. Joyce Western Corp., 873 F.2d 126, 128 (6th Cir.1989). The Board has the burden to establish the gross amount of backpay due. The burden then shifts to the wrongdoer to prove any circumstances that might limit its liability. Ibid.
 
 A. Mayes
 
 7
 Before his unlawful discharge, Mayes earned $6.50 per hour as a maintenance mechanic. He was discharged on August 27, 1982. From August 27 to October 31, 1982, Mayes was unable to find work. He then obtained employment at Memphis State University doing comparable work, at $6.19 per hour. He held this job at that rate until November 3, 1983, approximately one year. In November 1983, Mayes received a better job offer in El Paso, Texas, working for his brother, and so he and his family relocated. Mayes incurred moving expenses in the amount of $895.80. The new job paid $70 per week more than his job at Memphis State University.
 
 
 8
 Mayes worked for his brother from the end of 1983 until May 23, 1985. Mayes left Texas because the company was struggling and he and his brother were not seeing "eye-to-eye." Mayes's decision to leave Texas proved correct, as his brother's company disbanded in the summer of 1985. Mayes returned to Memphis and obtained employment at Burnett Freeman at $7.15 per hour. His moving expenses for returning to Memphis were $921.63. Mayes worked at Burnett Freeman until November 1987, when he returned to Memphis State at the rate of $8.57 per hour. Mayes was at Memphis State when Baddour offered reinstatement in November 1988.
 
 
 9
 The total amount due was calculated by first determining what Mayes would have made had he stayed in his job at Baddour for the entire period. The Board then subtracted Mayes's interim earnings for the entire period, and added Mayes's expenses incurred moving to and from Texas. The amount due by this method was $9,730.23. Baddour now contends that once Mayes left Memphis for Texas, he ceased to mitigate damages, because he abandoned substantially equivalent work. Accordingly, Baddour requests that Mayes not receive moving expenses and backpay once he left the position at Memphis State University.
 
 
 10
 We reject Baddour's position. Baddour is correct that deductions are made from backpay calculations for losses that the employee wrongfully incurred by a failure to take acceptable interim employment. Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 198-200, 61 S.Ct. 845, 854-55 (1941). However, an employee has not willfully incurred a loss of earnings where he has made a good-faith effort to obtain interim employment. A "wrongfully discharged employee is only required to make a reasonable effort to mitigate damages, and is not held to the highest standard of diligence. That burden is not onerous, and does not mandate that the employee be successful in mitigating the damage." NLRB v. Westin Hotel, 758 F.2d 1126, 1130 (6th Cir.1985). In determining whether an employee willfully failed to mitigate damages, this court will look to the sincerity and good-faith efforts of the employee. Ibid.
 
 
 11
 Big Three Industrial Gas & Equipment Co. ("Big Three"), 263 NLRB 1202 (1982), enforced, 579 F.2d 304 (5th Cir.1978), presents analogous facts. In that case, the injured worker obtained interim employment in the town where the wrongdoer was located. The employee left this interim employment and moved across the county to take a more secure position with another company. The Board ruled that the employee had not abandoned substantially equivalent employment by moving to a new locale, and that the employer had a continuing obligation to pay backpay and reasonable moving expenses. The Board stated that in order for an employer to meet its burden of showing a willful loss of earnings by alleged abandonment of interim employment, the employer must show that the employee's overall earnings at the interim employer would have been at least equal to those he would have received from the wrongdoer.
 
 
 12
 Applying these principles to the present case, Mayes was earning $6.19 an hour at Memphis State, compared to $6.50 per hour at Baddour. As the Board noted, the company did not meet its burden of demonstrating that Mayes's earnings at Memphis State University would have been at least equal to those he would have received at Baddour. The company also cannot point to any bad faith or lack of effort on the part of the employee. By moving to Texas, Mayes was only trying to better his financial situation. Indeed, by accepting this new job, Mayes increased his interim earnings, and thereby lessened the company's financial burden.[2] In effect, Baddour seeks to punish the employee for bettering Baddour's position as well as his own.
 
 
 13
 Mayes's decision to return to Memphis also was reasonable. He earned more money at Burnett Freeman than he had in El Paso, further lessening Baddour's liability. Moreover, Mayes's move showed acumen. His brother's company collapsed soon after Mayes departed. Accordingly, the move back to Memphis furthered the mitigation of damages, and his earnings may properly be adjusted to reflect his travel expenses incurred to secure this job.
 
 B. Williams
 
 14
 Jerry Williams was working as a cart controller when he was demoted to the position of consolidator in October 1982. While in this new position, he suffered a back injury that temporarily disabled him. In November 1982, a charge was filed with the NLRB asserting that Williams was unlawfully demoted. On April 11, 1993, Williams returned to work from his injury, and the company allowed him to return to his former job as cart controller. A few hours later, before Williams had time to take a lunch break, the company informed Williams that he was terminated as part of a work force reduction. On October 10, 1983, the Board issued its decision in the unfair labor practice case. With no discussion of the events that occurred in April, the Board ordered that Williams be reinstated to the position of cart controller. This court enforced that order.
 
 
 15
 In the supplemental proceeding, the Board found that the Company failed to comply with the Board's reinstatement order. The Board stated that the Company's "actions in permitting Williams to return to his cart controller position for all of one morning and then terminating him on the grounds that this job had been eliminated constituted no offer of reinstatement whatsoever." The Board also concluded that the company continued to employ others to perform Williams's job as cart controller. The position was never actually terminated. Accordingly, the Board found that Baddour never complied with the original order, and that backpay was due up to the present. The total amount was $34,613.43.
 
 
 16
 Baddour opposes enforcement of the order. According to the Company, Williams was reinstated, and then lawfully terminated a few hours later. At no time has an action been brought contesting the propriety of this termination. Baddour contends that the Board's actions violate due process because the company has not had an opportunity to defend against charges that its termination was unlawful.
 
 
 17
 This position is meritless. At the supplemental hearing, the Regional Director argued that a proper reinstatement never occurred. Baddour had ample opportunity to defend itself against this charge by showing that it had in fact reinstated the employee, and then validly terminated him. The Board rejected Baddour's position. Moreover, Baddour never seriously challenged the fact that other employees continued to perform Williams's job as cart controller. Contrary to Baddour's suggestion, a new proceeding is not necessary. Due process was satisfied. The Board's holding, that Baddour never reinstated the employee and the company was in violation of the original order, was proper.
 
 
 18
 For the reasons stated, we ENFORCE the order of the National Labor Relations Board.
 
 
 
 [1]
 The Honorable Benjamin F. Gibson, Chief United States District Court Judge for the Western District of Michigan, sitting by designation
 
 
 [2]
 Even taking account of the travel expenses, Baddour still improved its position when Mayes went to Texas rather than remaining at Memphis State at the salary he was then receiving. Baddour argues that Mayes would have received raises at Memphis State that would have made this job more financially rewarding. However, this prospect of advancement is speculative, and the worker is not bound to gamble on speculative pay raises